UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NUMBER: 1:25-cv-372

JESSICA DUIS, M.D., an individual,

Plaintiff,

v.

THE UNIVERSITY OF COLORADO, by and through its Board, the Regents of the University of Colorado, a body corporate; and SHAWN MCCANDLESS, an individual,

Defendants.

## COMPLAINT

Jessica Duis, M.D. ("Dr. Duis" or "Plaintiff"), by her undersigned attorneys, states as follows for her Complaint against The University of Colorado, by and through its Board, the Regents of the University of Colorado ("University") and Shawn McCandless, M.D. ("Dr. McCandless") (collectively "Defendants"):

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367.

2. This Court has personal jurisdiction over the University because it employs individuals in Colorado, formerly employed Plaintiff in Colorado, and otherwise conducts substantial business in the state.

1

3. This Court has personal jurisdiction over Dr. McCandless because he is a resident of the State of Colorado.

4. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq.* ("CADA"). More specifically, this action arises from the conduct of the University in discriminating against its female employees and terminating their employment or demoting them if they complain and Dr. McCandless aiding and abetting the discrimination and retaliation.

5. Venue is proper in this Court because all actions complained of were carried out within the State of Colorado, and Plaintiff was employed by the University in the State of Colorado.

6. The Colorado state law claims pursuant to CADA are so like and related to the Federal Title VII claims in this lawsuit that they form part of the same case or controversy, and thus supplemental jurisdiction over the CADA claims against the University and Dr. McCandless is proper.

7. Plaintiff met all procedural pre-requisites for, and timely filed, this Complaint pursuant to Title VII and CADA.

## THE PARTIES

8. Dr. Duis is a medical doctor and a resident of Colorado. She was an Associate Professor in the Section Genetics and Inherited Metabolic Disease within the Department of Pediatrics, School of Medicine at the University.

9. The University of Colorado is a political subdivision of the State of Colorado.

10. Dr. McCandless is an individual who is a resident of Colorado and is currently employed by the University of Colorado.

## GENERAL ALLEGATIONS

11. Dr. Duis is an esteemed, internationally recognized expert in multiple rare genetic diseases, specializing in clinical studies and providing medical care to children who have genetic abnormalities with chromosome 15.

12. The University hired Dr. Duis on or around January 6, 2020, as an Assistant Professor in the Section of Genetics and Metabolism, Department of Pediatrics.

13. Though her title was Assistant Professor, she was lured to Colorado with the understanding that she would be promoted to Associate professor "at the next annual opportunity," which meant that she would submit promotion materials in the summer of 2020 and the anticipated promotion would become effective in July 2021.

14. Additionally, it was the expectation and written understanding of the parties that Dr. Duis was being recruited to come to the University to establish and become the Medical Director for one or more rare disease clinics to treat patients with Prader-Willi Syndrome and Angelman Syndrome.

15. Dr. Duis' primary supervisor was Shawn McCandless, M.D. ("Dr. McCandless"), Section Head Genetics and Inherited Metabolic Disease, Department of Pediatrics.

16. After beginning her employment at the University, Dr. Duis was immediately met with a prevalent and permeating culture of chauvinism and misogyny, led by Dr. McCandless.

17. Dr. McCandless engages in a pattern and practice of harassing female employees, including: name calling, denigrating their work, preventing their advancements, and downplaying their professional achievements and accolades.

18. Dr. Duis was not immune from Dr. McCandless' sex-based discrimination and harassment.

3

19. Dr. McCandless openly denigrated and demeaned Dr. Duis.

20. Dr. McCandless painted Dr. Duis in a negative light by telling people that she was difficult to work with.

21. Dr. McCandless also downplayed Dr. Duis' accolades and misrepresented to colleagues the role that Dr. Duis was hired for.

22. Upon information and belief, Dr. McCandless told Director of Research Operations Erin Sandene and others that Dr. Duis was hired as a full-time clinical position and did not have any support to do research. This negatively impacted what resources were available to Dr. Duis and how she was treated by her colleagues.

23. By undermining her in this way, Dr. McCandless created animosity towards her from administrative staff at the Children's Hospital of Colorado Research Institute where Dr. Duis performed her clinical and research duties.

24. By creating a negative narrative about Dr. Duis, it undermined her ability to build collegial relationships and conduct research.

25. Dr. McCandless used sexist terms to describe Dr. Duis to colleagues, including calling her a "bull in a China shop," a "pain in the ass," and "difficult."

26. Dr. McCandless compared Dr. Duis to a television character, describing Dr. Duis as selfish and impulsive, without regards to others.

27. Dr. McCandless did not denigrate his male colleagues like he did Dr. Duis.

28. Despite promises made to Dr. Duis during the recruitment process, Dr. McCandless did not nominate or support Dr. Duis for promotion in 2021 when he was supposed to.

29. Dr. McCandless stated that he did not feel Dr. Duis was ready for a promotion given

her time as an attending physician. However, he knew how long she was an attending physician when she was hired, knew what she was promised, and yet still objected after she was employed.

30. Dr. McCandless openly questioned Dr. Duis' accomplishments, stating that he was skeptical she really could have achieved everything in the short time she had been practicing medicine.

31. Dr. McCandless stated that Dr. Duis would need to present him with evidence to prove her accomplishments.

32. Dr. McCandless did not act incredulous about his male colleagues' accomplishments.

33. In fact, Dr. McCandless regularly praised his male colleagues' accomplishments.

34. Dr. McCandless was open about treating his male and female colleagues differently. During department meetings, he consistently provided positive feedback for men and would nit-pick and argue with women.

35. On calls with colleagues, Dr. McCandless yelled at Dr. Duis and told her not to seek feedback from patient caregivers without first seeking his permission.

36. Dr. McCandless told Dr. Duis: "I need to know everything you're doing. You need to get permission from me before you do anything."

37. Dr. McCandless did not require male physicians to seek his permission before asking for feedback or to "do anything."

38. In May of 2021, Dr. McCandless told Dr. Duis that all referrals for Angelman Syndrome would not be seen by Dr. Duis.

39. This made no sense, as Dr. Duis is a world-renowned expert in Angelman Syndrome and patients were getting referred to her clinic in Colorado from all over the world specifically seeking her expertise.

40. This is in significant contrast to how Dr. McCandless treated male physicians, who Dr. McCandless allowed to always see patients who sought out their expertise.

41. For example, Dr. Johan Van Hove saw all the nonketotic hyperglycinemia patients, Dr. Austin Larson and Dr. Johan Van Hove saw all the mitochondrial patients, and Dr. Peter Baker saw all the abnormal newborn screens.

42. When Dr. Duis objected to not being able to see patients who sought her expertise, Dr. McCandless was dismissive during a conference call with multiple other employees, stating that she was "wasting people's time"

43. In March 2021 it became clear that Dr. McCandless was not going to support Dr. Duis' promotion to Associate Professor as originally promised and instead put up an administrative roadblock so that she could not even be considered for promotion.

44. Because Dr. McCandless did not support Dr. Duis' promotion as originally intended and promised, Dr. Duis approached Dr. Mark Abzug, Chair of the Promotions Committee to seek promotion.

45. Dr. Abzug facilitated Dr. Duis' promotion by requiring Dr. McCandless to comply with submitting Dr. Duis' name for midpoint review and promotion.

46. Dr. McCandless did not create roadblocks for male physicians seeking promotion like he did to Dr. Duis.

47. Despite Dr. McCandless' disapproval, Dr. Duis named Content Director of Genetics and Biochemistry for the University of Colorado School of Medicine starting in January 2021.

48. Dr. McCandless never congratulated Dr. Duis or even addressed the fact that that she earned the new title.

49. Instead, weeks or months later, Dr. McCandless showed open disdain for Dr. Duis and told her that there were more qualified male candidates who should have gotten the role instead of her.

50. Dr. Duis initially complained about the sexism and discrimination to colleagues and the Office of Professionalism, who discouraged her from pursuing a formal complaint.

51. However, in talking with other female employees, Dr. Duis learned that she had a similar experience to them and that multiple women were experiencing sexual discrimination and harassment from Dr. McCandless.

52. Thus, a group of University female employees formed to assert a collective complaint.

53. In August of 2021, six female employees of the University, including Dr. Duis, other physicians, and genetic counselors complained as a group to Dr. Andrew Sirotnak about gender discrimination.

54. Dr. Sirotnak said that he would formally escalate the concerns.

55. Despite Dr. Sirotnak's promises to the group of women, months passed without an investigation or action.

56. Upon information and belief, the University failed to ever appropriately respond to or investigate the gender-based complaints of discrimination and harassment against Dr. McCandless.

57. After Dr. Duis complained about discrimination and harassment, Dr. McCandless became even more hostile towards her in retaliation for her complaints.

58. For example, after her complaint, she was no longer consulted about interviewing employees, resident promotion programs, or other personnel issues.

59. After she was promoted, Dr. Duis' name plaque on her office was never changed until she specifically requested that it reflect her current title. No other employees had to make this request

as it was typically done automatically.

60. Additionally, without asking her, the University retaliated by moving her out of her cherished, large office with windows into a closet of an office without any windows. A more junior colleague was moved from the closet office to a larger office with windows.

61. Dr. McCandless told Dr. Duis that he needed to be kept apprised of every research application or ambition of Dr. Duis so that he could vet and approve them before submitting.

62. Dr. McCandless never had this requirement for male physicians who he supervised.

63. As Dr. McCandless openly undermined and denigrated Dr. Duis to her colleagues, it began having a negative impact on her support throughout the University.

64. Despite the lack of support, Dr. Duis continued to thrive in many aspects of her role.

65. Whenever Dr. Duis published papers or obtained grants, Dr. McCandless downplayed or ignored her achievements.

66. In contrast, Dr. McCandless openly praised the achievements of Dr. Duis' male colleagues who were underachieving in comparison with Dr. Duis.

67. In her role as an Associate Professor, Dr. Duis' primary path to promotion was success in her clinical research all of which was required to be conducted under the Child Health Research Enterprise ("CHRE").

68. CHRE had many problems with internal coordination and communication when Dr. Duis began working at the University.

69. Despite numerous ongoing issues within CHRE, Dr. Duis did her best to work cordially with everyone at CHRE to achieve her research and clinical objectives and provide the best possible care for her patients.

70. Dr. Duis offered to support coordinators' duties when they mentioned that they were overwhelmed due to the amount of work being required of them.

71. However, Dr. Duis' efforts were undermined by Dr. McCandless who persistently badmouthed Dr. Duis to colleagues, including those who worked at CHRE.

72. Dr. McCandless' negativity and discriminatory animus poisoned the well of Dr. Duis' employment, causing others within the University and affiliated organizations to feel comfortable deprioritizing—or altogether ignoring—Dr. Duis' requests and instructions.

73. Due to her lack of support from Dr. McCandless, Dr. Duis lacked support in her research and this led to balls being dropped on her research.

74. Dr. Duis, because of her unique qualifications, was able to secure massive funding grants for research and clinical trials for Prader-Willi Syndrome and Angelman Syndrome.

75. One of those research grants was for $1.2 million from the Foundation for Angelman Syndrome Therapeutics ("FAST").

76. As part of the FAST grant, Dr. Duis needed the CHRE to hire a nurse who would be dedicated to the study. Dr. Duis had prior conversations with the CHRE and nursing administration prior to applying for the grant. However, CHRE never hired the nurse, constantly putting off supporting this need and offering too little too late, which resulted in the grant being revoked in September 2022.

77. Dr. Duis was naturally frustrated with the loss of the FAST grant but did not let it discourage her. Instead, she continued to work diligently and collaboratively to gain support for her research and clinical trials.

78. In addition to losing the $1.2 million grant, staff at the CHRE messed up multiple other clinical trials which resulted in lost data, patients being mistreated, and loss of grants.

9

79. For example, Dr. Duis led an Angelman Natural History Study. During the study, CHRE employees billed a substantial number of hours to the project but had few billable deliverables completed to receive payment from the grant, effectively causing a large deficit. Dr. Duis was never provided timely information to reflect that deliverables were not being completed, despite weekly meetings with the coordinator and her supervisor.

80. On another study, the Ionis Study, CHRE agreed to accept six patients. However, at the last minute, Program Manager Samatha Bates stated that CHRE would not accept the sixth patient, despite it being potentially life-changing precision therapy for a debilitating rare disorder and the patient's family having already been notified of accepted participation in the study.

81. When Dr. Duis rightfully stood up for her patient, Ms. Bates and others criticized Dr. Duis by fabricating facts and parroting Dr. McCandless' claim that Dr. Duis was just being difficult.

82. On the Gait Study, CHRE employees mixed up which devices were associated with which patients which resulted in needing to throw out years of research. When Dr. Duis realized that it was all messed up, she began asking questions and was told "the data is fine" but it was not. Additionally, a CHRE employee sent a patient's medical information to the wrong recipient.

83. Initially, in response to all of the problems in the CHRE, University Research Medical Director Stanley Szefler, M.D. and Children's Hospital of Colorado, Chief Scientific Officer Ron Sokol, M.D. stated that they understood Dr. Duis' concerns with the CHRE and would work with her to address them.

84. However, upon information and belief, Dr. McCandless encouraged Dr. Szefler and Dr. Sokol that Dr. Duis was the problem by continuing to describe her as difficult, selfish, and flawed. This led to Dr. Duis becoming a scapegoat for the known shortcomings of the CHRE, even though

everyone involved knew the problems did not center around Dr. Duis and had predated her arrival in Colorado by many years.

85. Despite Dr. McCandless' hostility towards Dr. Duis, many who worked with Dr. Duis recognized her value, tried to support her, and recognized that she was not getting the support she needed. However, over time, Dr. McCandless continued to poison the well, which resulted in multiple individuals blaming Dr. Duis, even though she was not at fault.

86. By 2023, it was clear that Dr. Duis was never going to succeed while working under Dr. McCandless, and she began exploring other options for continued employment at the University because she wanted to continue her career in academia.

87. In May of 2023, Dr. Duis began exploring whether she could move departments to conduct all of her clinical care under the Section of Pediatrics Special Care Clinic under the supervision of Dr. Chris Stille and move her research to the Clinical Neuroscience Research Division ("NART") in order to escape the discrimination and harassment she experienced from Dr. McCandless.

88. To that end, she met with a number of physicians and administrators who were supportive of her transition but stated the barrier would be Dr. McCandless allowing the transition to occur.

89. Indeed, Dr. McCandless blocked Dr. Duis from transitioning to NART.

90. On June 20, 2023, Dr. Duis met with Dr. McCandless and others to discuss concerns related to CHRE.

91. During that meeting, or around this time, Dr. McCandless complained to Dr. Duis stating: "I spend so much time on you. I'm so tired of spending time on you."

92. At that meeting, Dr. McCandless stated that he and CHRE agreed that Dr. Duis would

11

no longer be able to do research at CHCO due to concerns related to her communication.

93. When Dr. Duis pushed back on this, she learned that there was apparent disagreement among decision-makers as to whether Dr. Duis could continue research.

94. Ultimately, it was decided that Dr. Duis may be allowed to continue research after a 360-performance review and correction of her alleged communication issues, which Dr. McCandless described as a "personality flaw" that could not be fixed.

95. A 360-performance review was conducted for Dr. Duis in the summer of 2023 and she received the results on August 23, 2023.

96. Throughout her 360-performance review, Dr. Duis received glowing feedback from 15 of her colleagues and coworkers including those who worked with her at the CHRE.

97. However, the feedback she received from Dr. McCandless and Dr. Sirotnak was incredibly negative due to their discriminatory and retaliatory animus towards Dr. Duis.

98. After receiving positive feedback from the majority of participants but receiving overwhelmingly negative feedback from her harasser, Dr. Duis approached Dr. McCandless to ask whether she could now continue doing her research.

99. Dr. McCandless responded that "I don't know if there is any process for you to ever do research ever again."

100. While Dr. McCandless was orally indicating to Dr. Duis that she was going to be phased out of research, he continued to formally state a different position in writing, apparently aware that his stated position made no business or practical sense.

101. However, in light of the way in which she was treated and threatened by Dr. McCandless, Dr. Duis became fearful that she was about to lose her job and confident that she would

12

never gain his support.

102. The totality of the hostility, discrimination, and retaliation was sufficiently severe that it altered the terms and conditions of Dr. Duis' employment.

103. Due to the way that she was treated, Dr. Duis reasonably became fearful that she would be terminated and/or that her professional reputation would be tarnished if she remained employed with Dr. McCandless as her supervisor.

104. To that end, Dr. Duis felt compelled to begin exploring other employment options away from the University, and thus she began listening to recruiters from "industry" who had been pursing her for years.

105. On August 29, 2023, Dr. Duis learned that Dr. McCandless was spreading a rumor that Dr. Duis was under investigation for "research misconduct" which was untrue, but it furthered her conviction that she was being compelled to seek employment elsewhere.

106. Despite the untrue nature of the statement, it caused a genetic counselor to stop working with Dr. Duis.

107. Due to her fear of being pushed out of her job and/or being restricted from doing research, she felt she had no choice but to seriously consider employment outside of the university.

108. However, Dr. Duis desired to continue seeing patients and complete her remaining research projects at the University, so she began by checking with human resources to learn whether she could stay on as a part-time employee.

109. To that end, Dr. Duis consulted with Human Resources Program Director Gene Leffick.

110. Ms. Leffick confirmed that it was possible for Dr. Duis to remain as a part-time

employee and stated that other physicians had previously done so successfully.

111. Other physicians and administrators were supportive of Dr. Duis staying part time.

112. Being able to stay in a part-time position was communicated and confirmed by multiple decision-makers within the University.

113. When Dr. Duis first communicated to Dr. McCandless that she intended on leaving, he responded, "I'm so relieved."

114. On September 6, 2023, Dr. Duis formally resigned from her full-time position based on her understanding that she could continue in a part-time role and because she felt like she had no choice but to quit her employment to salvage her reputation within the industry and avoid Dr. McCandless' harassment.

115. On September 8, 2023, Dr. McCandless told Dr. Duis that there was "nothing special or unique" about the care she provides patients and there are many physicians at Children's Hospital of Colorado who are as knowledgeable and capable as her, who could take care of Angelman and Prader Willi patients.

116. Dr. McCandless further communicated that he and a colleague decided that there was no need to keep her on staff, thereby formally terminating her employment, stating: "There is nothing special about you. You're not going to be allowed to stay on part time, you need to leave the university."

117. On or around December 14, 2023, Dr. Duis filed a charge of discrimination and retaliation with the Colorado Civil Rights Division against Dr. McCandless and the University and a charge of discrimination and retaliation with the Equal Employment Opportunity Commission against the University.

118. Following her termination, Dr. McCandless, Dr. Diana Walleigh, and others at the University besmirched Dr. Duis' name which resulted in lost employment opportunities.

119. For example, on or around June 26, 2024, Dr. Duis was informed that she was not selected as a candidate for the position she applied for. The reason she was not hired was because of an email accusing her of not being collaborative with academic partners.

120. Upon information and belief, the email and communication regarding Dr. Duis was a result of shared information from employees of the University, engaging in a pattern of discrimination and retaliating against her.

121. On or around October 13, 2023, Dr. Walleigh was outside of her office yelling accusations that Dr. Duis committed fraud.

122. Upon information and belief, Dr. Walleigh made accusations of fraud externally to one or more professional organizations with whom Dr. Duis is connected, including the Angelman Syndroe Foundation ("ASF"). Dr. Walleigh did this with the malicious intent of harming Dr. Duis' reputation and in retaliation for Dr. Duis' complaints of discrimination and claims filed against the University.

123. Additionally, Dr. McCandless has shared misinformation about Dr. Duis' clinical practice, access to resources, and conflicts of interest thereby preventing Dr. Duis' involvement in consortia and advisory boards with which she has previously been very involved as an expert on chromosome 15 disorders.

124. Specifically, on or around November 9, 2023, Dr. McCandless told a colleague that he "[wasn't] advocating for [Dr. Duis]" to become a member of the organization and the colleague told Dr. Duis to: "just make sure you have a good lawyer." That organization has stopped communicating with Dr. Duis since that time.

125. Dr. Walleigh has criticized Dr. Duis' medical practice, including by telling patients and their families that Dr. Duis was mismanaging their care. Dr. Walleigh has made these claims in bad faith and not because of a genuine belief that Dr. Duis has provided poor medical care.

126. Dr. Walleigh has indicated to patients and their families that Dr. Duis is putting her dispute with the University above the needs of patients and their families, something that she knows to be untrue but is stating for the purpose of retaliating against and defaming Dr. Duis.

127. The University's retaliation through defamation against Dr. Duis has had a substantially negative impact on her relationships and job prospects in the medical community and has caused her economic and non-economic damages.

### FIRST CLAIM FOR RELIEF—DISCRIMINATION & RETALIATION
### (Terms and Conditions of Employment, pursuant to Title VII & CADA--Against the University)

128. Plaintiff incorporates herein all of the foregoing allegations in this Complaint.

129. Plaintiff is a woman.

130. Plaintiff was an employee of the University.

131. The University discriminated against Plaintiff in the terms and conditions of her employment.

132. Plaintiff internally complained about sex-based discrimination and harassment.

133. After Plaintiff complained, the University discriminated against and retaliated against her in the terms and conditions of her employment by revoking her research privileges, forcing her to constructively discharge from her full-time position, and terminating her employment.

134. Plaintiff has incurred and continues to suffer economic damages because of the

16

University's discriminatory and retaliatory decisions.

135. Plaintiff has suffered emotional distress and other damages because of the discriminatory and retaliatory environment to which the University subjected her.

136. The University's conduct in discriminating and retaliating against Plaintiff has been deliberate and malicious and exhibits a wanton disregard of Plaintiff's rights.

## SECOND CLAIM FOR RELIEF— DISCRIMINATION & RETALIATION
**(Post-Employment Conduct, Pursuant to Title VII & CADA--Against the University)**

137. Plaintiff incorporates herein all of the foregoing allegations in this Complaint.

138. Plaintiff complained to the University about being discriminated against and harassed.

139. Plaintiff engaged in protected activities by filing a charge of discrimination and retaliation with the Equal Employment Opportunity Commission and the Colorado Civil Rights Division.

140. The University discriminated and retaliated against Plaintiff because Plaintiff opposed and complained of the discrimination, harassment, and retaliation to which she was subjected by making negative and false statements about Plaintiff to cause her hardship and lost economic opportunities.

141. Plaintiff has incurred and continues to suffer economic damages because of the University's discriminatory and retaliatory post-employment actions.

142. Plaintiff has suffered emotional distress and other damages because of the University's discriminatory and retaliatory actions following her termination of employment.

143. The University's conduct in subjecting Plaintiff to discrimination and retaliation has been deliberate and malicious and exhibits a wanton disregard for the rights of Plaintiff.

### THIRD CLAIM FOR RELIEF— DISCRIMINATION & RETALIATION
**(Aiding and Abetting Sex-Based Discrimination and Retaliation, Pursuant to CADA—Against Shawn McCandless)**

144. Plaintiff incorporates herein all of the foregoing allegations in this Complaint.

145. The University engaged in discriminatory, retaliatory, or other unfair employment practices as alleged herein.

146. Dr. McCandless knowingly aided, abetted, incited, compelled, or coerced the University to engage in the foregoing acts by supporting, recommending, directing, and/or carrying out those acts, knowing they were discriminatory and/or retaliatory.

147. The foregoing actions by Dr. McCandless were intentional and taken with malice and reckless indifference to Dr. Duis' rights under CADA.

148. Dr. McCandless's actions aided, abetted, incited, compelled, or coerced the University to engage in discriminatory, retaliatory, or other unfair employment practices, has caused Dr. Duis to suffer damages, including lost wages and benefits, emotional pain and suffering, mental anguish, and other non-pecuniary losses.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant her the following relief:

1. Back pay and actual damages in an amount to be shown at trial to compensate Plaintiff for lost wages, benefits, and employment opportunities;

2. Front pay in an amount to be shown at trial and/or reinstatement;

3. Compensatory damages, including emotional distress and reputational harm;

4. Punitive damages;

5. Reasonable attorneys' fees and costs, including expert witness fees;

6. Pre-judgment and post-judgment interest;

7. Compensation for consequential damages in the form of taxes incurred;

8. Permanent injunction restraining these violations of the Civil Rights Act of 1866 and the Civil Rights Act of 1964; and

9. Such other and further relief as this Court deems necessary and proper.

**JURY TRIAL DEMAND**

Plaintiff respectfully requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted this 4th day of February 2025.

JESTER GIBSON & MOORE, LLP

  */s/    Justin M. Plaskov*
Justin M. Plaskov, #45053
jplaskov@jgllp.com
1999 Broadway, Ste. 3225
Denver, CO 80202
(303) 377-7888